BRODSKY & SMITH, LLC
Evan J. Smith (SBN 242352)
esmith@brodsky-smith.com
9595 Wilshire Boulevard, Suite 900
Beverly Hills, CA 90212
Tel: (877) 534-2590
Fax: (310) 247-0160

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ALAN S. EDELMAN,<br><br>Plaintiff,<br><br>vs.<br><br>RELYPSA, INC., DANIEL K. SPIEGELMAN, JOHN P. BUTLER, PAUL J. HASTINGS, KENNETH J. HILLAN, DAVID W. J. MCGIRR, JOHN A. ORWIN, THOMAS J. SCHUETZ, HELEN TORLEY, GALENICA AG and VIFOR PHARMA USA INC.,<br><br>Defendants. | Case No.:<br><br>Judge:<br><br>Dept.:<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Alan S. Edelman ("Plaintiff"), by and through his attorneys, alleges upon personal knowledge as to himself, and upon information and belief based upon, among other things, the investigation of counsel as to all other allegations herein, as follows:

**SUMMARY OF THE ACTION**

1. This is a shareholder action brought by Plaintiff, a holder of the common stock of Relypsa, Inc. ("Relypsa" or the "Company"), against the Board of Directors of Relypsa ("Individual Defendants" or "Board") for their violations of Sections 14 and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rules and Regulations promulgated

thereunder, including Rule 14, in connection with the proposed acquisition ("Proposed Transaction") of the publicly owned shares of Relypsa common stock by Galenica AG ("Galenica" or "Parent"), through its wholly owned subsidiary Vifor Pharma USA Inc. ("Merger Sub").

2. Founded in October 2007 and headquartered in Redwood City, Calif., Relypsa completed an initial public offering in November 2013 and is traded on the NASDAQ Stock Market under the symbol RLYP.

3. Relypsa is a biopharmaceutical company leading the discovery, development and commercialization of polymer-based medicines to treat conditions that are often overlooked and undertreated, but that can have a serious impact on patient lives or even be life-threatening. Relypsa is focused on developing medicines that will change treatment paradigms. Relypsa's unique technology platform includes a proprietary high-throughput chemistry process, enabling it to efficiently explore thousands of potential polymer medicines for each disease it seeks to address.

4. The Company's polymers are non-absorbed, meaning they act within the gastrointestinal tract and do not get absorbed into the bloodstream or other parts of the body. Relypsa's polymer technology may be able to address many health conditions in need of viable treatment options.

5. On July 21, 2016, Galenica and Relypsa jointly announced that they had entered into a definitive agreement ("Merger Agreement") under which Galenica will commence a tender offer to acquire Relypsa for $32 per share in cash for total consideration of approximately $1.53 billion ("Offer"). On August 4, 2016, Galenica issued a press release announcing the commencement of the Offer.

6. The proposed consideration is woefully inadequate in light of Relypsa's true value and its growth prospects. According to Yahoo! Finance, at least one analyst covering Relypsa has set a price target of $51.00 per share, or nearly 60% higher than the consideration in the Proposed Transaction, and the average analyst price target is $35.50 per share, or nearly 11% higher than the consideration in the Proposed Transaction. Indeed, even the Discounted Cash Flow ("DCF") analyses of Relypsa's own financial advisors in connection with the Proposed Transaction imply valuations as high as $44.30 per Relypsa share.

7. Furthermore, according to Yahoo! Finance, in its most recent reported financial results before the announcement of the Offer, Relypsa's reported earnings exceeded analysts' estimates by approximately 13.4%. Moreover, Relypsa's sales revenue is expected to grow approximately 78.5% this year and 118% next year.

8. In facilitating the acquisition of Relypsa by Galenica for inadequate consideration each of the Defendants (defined below) breached and/or aided the other Defendants' breaches of their fiduciary duties.

9. The Board further exacerbated their breaches of fiduciary duty by agreeing to lock up the Proposed Transaction with deal protection devices that preclude other bidders from making a successful competing offer for the Company. Specifically, pursuant to the Merger Agreement, Defendants agreed to: (i) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirers or from continuing discussions and negotiations with potential acquirers; (ii) an "information rights" provision that grants Galenica access to any rival bids, the material terms thereof, and the bidder's identity; (iii) a "matching rights" provision that provides Galenica with three (3) business days to match any competing superior proposal before the Board can effectuate a Company Board Recommendation Change (as defined in the Merger

Agreement); and (iv) a provision that requires Relypsa to pay Galenica a termination fee of up to $49 million following termination of the Merger Agreement under specified circumstances including if Relypsa enters into a superior alternative transaction.

10. These provisions substantially and improperly prevent the third parties that are most likely to submit a superior proposal from making such a bid and impede the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives including a sale of all or part of Relypsa.

11. On August 4, 2016, in violation of Sections 14(e) and 20(a) of the Exchange Act, Defendants filed, or caused to be filed, with the U.S. Securities and Exchange Commission ("SEC") a false and materially misleading Solicitation/Recommendation Statement on Schedule 14D-9 (the "Recommendation Statement") in order to recommend that the Company's shareholders tender their shares in the Offer. However, the Recommendation Statement fails to disclose and misstates material information concerning: (a) the sales process; (b) the discussions underlying management's continued employment; (c) conflicts of interest of Centerview Partners LLC ("Centerview"), the Company's main advisor in connection with the Proposed Transaction; (d) potential conflicts of interest of defendant John P. Butler, a director of Relypsa; (e) management projections; (f) the forecasted fully-taxed unlevered free cash flows of Relypsa utilized by Centerview and Relypsa's other financial advisor, Merrill Lynch, Pierce, Fenner & Smith Incorporated ("BofA"), in their DCF analyses; and (g) the details regarding the valuation analyses that purportedly supported the fairness opinions of Centerview and BofA. Absent full and accurate disclosure of the foregoing, Relypsa's public stockholders will be forced to tender, or otherwise surrender, their Relypsa shares with incomplete and misleading information.

12. For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Individual Defendants' (as defined herein) violations of their fiduciary duties and from Galenica.

## JURISDICTION AND VENUE

13. Jurisdiction is founded upon federal question jurisdiction, pursuant to §27 of the Exchange Act, as amended, 15 U.S.C. §78aa, and 28 U.S.C. § 1331.

14. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because Defendants systematically conducted business on a regular basis in this District and/or reside in this District and the wrongful conduct complained of herein occurred in this District .

## PARTIES

15. Plaintiff is, and at all relevant times was, a continuous stockholder of Relypsa.

16. Relypsa is a Delaware corporation with its principal executive offices located at 100 Cardinal Way, Redwood City, CA 94063.

17. Defendant Daniel K. Spiegelman has served as Chairman of the Company.

18. Defendant John P. Butler has served as a director of the Company.

19. Defendant Paul J. Hastings has served as a director of the Company.

20. Defendant Kenneth J. Hillan has served as a director of the Company.

21. Defendant David W. J. McGirr has served as a director of the Company.

22. Defendant John A. Orwin has served as a director of the Company.

23. Defendant Thomas J. Schuetz has served as a director of the Company.

24. Defendant Helen Torley has served as a director of the Company.

25. Defendants Spiegelman, Butler, Hastings, Hillan, McGirr, Orwin, Schuetz and

Torley are collectively referred to herein as the "Board" or the "Individual Defendants."

26. Defendant Galenica is a public limited company existing under the laws of Switzerland.

27. Defendant Merger Sub is a Delaware corporation and a wholly owned subsidiary of Galenica.

28. Collectively, Relypsa, the Individual Defendants, Galenica and Merger Sub are referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A. Company Background

29. Founded in October 2007 and headquartered in Redwood City, Calif., Relypsa completed an initial public offering in November 2013 and is traded on the NASDAQ Stock Market under the symbol RLYP.

30. Relypsa is a biopharmaceutical company leading the discovery, development and commercialization of polymer-based medicines to treat conditions that are often overlooked and undertreated, but that can have a serious impact on patient lives or even be life-threatening. Relypsa is focused on developing medicines that will change treatment paradigms. Relypsa's unique technology platform includes a proprietary high-throughput chemistry process, enabling it to efficiently explore thousands of potential polymer medicines for each disease it seeks to address. The Company's polymers are non-absorbed, meaning they act within the gastrointestinal tract and do not get absorbed into the bloodstream or other parts of the body. Relypsa's polymer technology may be able to address many health conditions in need of viable treatment options.

31. On October 21, 2015, the U.S. Food and Drug Administration ("FDA") approved

the Company's first drug, Veltassa (patiromer) for oral suspension, for treatment of hyperkalemia. Hyperkalemia is a life-threatening condition defined as abnormally elevated levels of potassium in the blood. The Company launched Veltassa in December 2015 and it is available for prescription to patients in the United States through a limited number of specialty pharmacies and specialty distributors. In August, 2015, Relypsa entered into a license agreement ("License Agreement") with Vifor Fresenius Medical Care Renal Pharma Ltd. ("VFMCRP"), a common company of Parent and Fresenius Medical Care AG & Co., to commercialize Veltassa throughout the world except for the United States and Japan.

32. Under the License Agreement, Relypsa received a non-refundable, non-creditable, upfront cash payment of $40.0 million from VFMCRP. Relypsa will also receive up to $125.0 million in milestone payments upon achievement of certain regulatory, commercial and sales-based milestones, and tiered, double-digit royalties up to 22% of annual net sales of the licensed products.

33. Although ZS Pharma, a wholly-owned subsidiary of AstraZeneca plc ("AstraZeneca"), has sought the approval of a New Drug Application ("NDA") for sodium zirconium cyclosilicate ("ZS-9"), an investigational medicine being developed for the treatment of hyperkalemia, which, if approved is expected to be competitive with Veltassa as a treatment for hyperkalemia, on May 27, 2016, AstraZeneca announced that the FDA denied the NDA. As noted by the Board on May 27, 2016, the FDA's decision regarding the ZS-9 NDA meant that ZS-9 was unlikely to be approved for sale in the United States for at least six to nine months, and possibly longer.

34. According to Yahoo! Finance, in its most recent reported financial results prior to the announcement of the Offer, Relypsa's reported earnings exceeded analysts' estimates by

approximately 13.4%. Moreover, Relypsa's sales revenue is expected to grow approximately 78.5% this year and 118% next year.

35. Despite the commercial success of Veltassa, and the implications of the FDA's denial of the ZS-9 NDA on Veltassa's future revenue, the Recommendation Statement fails to disclose what adjustments, if any, were made to the Company's financial projections as a result these developments. Moreover, despite the materiality of the License Agreement, which already granted Vifor exclusive commercial rights to Veltassa outside the US and Japan, the Recommendation Statement fails to disclose the progress and status of VFMCRP's efforts to commercialize Valtassa or the payments already due to Relypsa, but which are yet to be received, pursuant to the License Agreement. Indeed, as a result of the License Agreement, Galenica possessed unique and valuable information regarding Relypsa's only approved drug and its true commercial potential.

**B. <u>The Proposed Transaction</u>**

36. On July 21, 2016, Galenica and Relypsa issued a press release announcing the Proposed Transaction:

> Galenica Group (SIX: GALN) and Relypsa, Inc. (NASDAQ: RLYP) today announced that the companies have entered into a definitive agreement under which Galenica will acquire Relypsa. This transaction further strengthens Galenica's Business unit, Vifor Pharma, as the company will gain full global rights to the potassium binder Veltassa® (patiromer) for oral suspension and enhance its growing position as a global specialty pharmaceutical company. Under the terms of the merger agreement, Galenica will pay $32 per share in cash, or a total of approximately $1.53 billion. Through this acquisition, Vifor Pharma will gain a fully-integrated commercial organization in the United States and significantly strengthen its presence in the U.S. cardio-renal market, a key area of focus.
>
> **Transaction in Line With the Galenica Long-Term Growth Strategy**
>
> The transaction is in line with the Galenica strategy of growth through in-licensing and acquisitions that build on Vifor Pharma's emerging international

leadership in cardio-renal and gastroenterology therapies. It provides Vifor Pharma with full global rights to Veltassa. It will also significantly enhance the commercial visibility and presence of Vifor Pharma in the key cardio-renal market in the United States, where Relypsa has already established a significant and powerful specialist sales force. With the combination of the assets and products of Vifor Pharma, Vifor Fresenius Medical Care Renal Pharma (VFMCRP) and Relypsa, Vifor Pharma is positioned to become a major player in the United States in its core therapy areas.

The acquisition of Relypsa is expected to significantly strengthen Vifor Pharma ahead of the planned division of the Galenica Group into two independent companies in 2017, with an extensive specialist product portfolio to include both the intravenous iron deficiency treatment Ferinject® (ferric carboxymaltose) and Veltassa.

**Platform for Vifor Pharma to Become a Major Player in U.S. Cardio-Renal Market**

Relypsa is a biopharmaceutical company based in Redwood City, Calif., with more than 400 employees. The company, founded in 2007, is focused on the discovery, development and commercialization of polymeric medicines for patients with conditions that can be addressed in the gastrointestinal tract. Its lead product, Veltassa, was approved by the U.S. Food and Drug Administration (FDA) for the treatment of hyperkalemia in October 2015. Veltassa is the first medicine for treatment of people with elevated blood potassium levels to be approved in the United States in more than 50 years and the only hyperkalemia medicine with long-term data in its label supporting chronic use. Relypsa has developed an extensive specialist commercial organization in the United States targeting nephrologists and cardiologists and focused on developing market access and awareness. Hyperkalemia affects approximately 3 million people in the United States with stage 3 or 4 chronic kidney disease (CKD) and/or heart failure, giving Veltassa the potential to become a blockbuster medicine.

In August 2015, VFMCRP acquired the commercial rights to Veltassa outside the United States and Japan. Through the acquisition, Vifor Pharma will acquire the global rights to Veltassa. The medicine is currently under regulatory review in Europe.

"The combination of Vifor Pharma and Relypsa is an important step towards achieving our goal of building a world-leading specialty pharmaceutical company focused on nephrology, cardiology and gastroenterology medicines," said Etienne Jornod, executive chairman of Galenica. "This acquisition will give Vifor Pharma direct access to the key U.S. market, enabling us to maximize the potential of our compelling product portfolio and enhancing our growing attraction as an international partner of choice. This transaction demonstrates the commitment of the Galenica Board of Directors to achieve the separation of Vifor Pharma and

Galenica Santé, with both businesses in the strongest possible position. We look forward to welcoming Relypsa to Vifor Pharma."

"We are very proud of the team that built Relypsa into the company it is today and brought Veltassa to patients in need. Vifor Pharma is a recognized international leader in the cardio-renal space that shares a strong commitment to patients and closely aligned values with Relypsa," said John A. Orwin, president and chief executive officer of Relypsa. "We are excited to announce this transaction today, which we believe offers significant and immediate value to our shareholders. We look forward to continuing our mission of improving patients' lives as part of the Vifor Pharma organization and are confident that our combined expertise, resources and commercial strength will help us build on the significant progress we have made since launching Veltassa in the United States."

**Offer Recommended by Relypsa Board of Directors**

Under the terms of the merger agreement, Galenica will commence a tender offer to acquire all of the issued and outstanding common stock of Relypsa for $32 per share. The implied fully-diluted equity value of the offer amounts to $1.53 billion.

The Boards of Directors of both Relypsa and Galenica have approved the terms of the merger agreement, and the Board of Directors of Relypsa has resolved to recommend that shareholders accept the offer, once it is commenced.

The acquisition is structured as an all-cash tender offer for all outstanding issued common stock of Relypsa followed by a merger in which remaining shares of Relypsa would be converted into the same U.S. dollar per share consideration as in the tender offer. The transaction is not subject to a financing condition.

**Completion Anticipated During the Third Quarter 2016**

Subject to customary conditions, including the tender of the majority of the outstanding Relypsa shares and the expiration or earlier termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, the transaction is expected to close during the third quarter of 2016. Relypsa is expected to be delisted from the NASDAQ and integrated into Vifor Pharma thereafter.

Vifor Pharma intends to retain the Relypsa leadership team in order to support the integration of Relypsa into Vifor Pharma, as well as the ongoing business and future development of Veltassa.

Credit Suisse acted as the sole financial adviser to Galenica for this transaction. Centerview and BofA Merrill Lynch acted as financial advisers to Relypsa.

Jones Day acted as the legal adviser to Galenica for this transaction. Latham & Watkins LLP acted as legal adviser to Relypsa.

> **Financing and Proposed Division of Galenica Group**
>
> As Galenica previously announced in May 2016, preparations continue for the division of the Galenica Group into two independent listed companies. The acquisition of Relypsa affirms the commitment of the Galenica Board of Directors to this strategy, adding further breadth and scale to the Vifor Pharma specialty portfolio.
>
> Galenica has secured committed bridge loan financing from Credit Suisse which, in addition to the Galenica existing cash and cash equivalents, is available to finance the transaction.
>
> Galenica plans to refinance a portion of the bridge loan through equity proceeds to be raised in conjunction with the envisaged division of the Group in the course of 2017, either through an initial public offering of Galenica Santé or through another option such as an equity increase. Galenica intends to raise sufficient equity to maintain implied investment grade ratings at both Vifor Pharma and Galenica Santé in the medium term after the separation of the Group.

## C. The Unfair Price

37. Pursuant to the Merger Agreement, on August 4, 2016, Galenica commenced the Offer to acquire the common shares of Relypsa for $32 per share in cash.

38. The proposed consideration is woefully inadequate in light of Relypsa's true value and its growth prospects. According to Yahoo! Finance, at least one analyst covering Relypsa has set a price target of $51.00 per share, or nearly 60% higher than the consideration in the Proposed Transaction, and the average analyst price target is $35.50 per share, or nearly 11% higher than the consideration in the Proposed Transaction.

39. Indeed, even Relypsa's own financial advisors have indicated that the Company's shares may be significantly more valuable than the consideration in the Proposed Transaction. Specifically, in its DCF Analysis, Centerview derived an implied value for Relypsa shares as high as $43.20 and BofA derived an implied value as high as $44.30. Indeed, under Centerview's analysis, unless the worst of management's forecasted revenue cases is presumed, the proposed consideration is either at the low end, or significantly below, the implied per share price ranges.

40. As these indicators make clear, Relypsa, if properly exposed to the market for corporate control, would bring a price materially in excess of the amount offered in the Proposed Transaction.

**D. The Preclusive Deal Protection Devices**

41. As part of the Merger Agreement, Defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no competing offers will emerge for the Company.

42. The Merger Agreement nevertheless contains a strict "no solicitation" provision. Pursuant to §5.3(a) of the Merger Agreement, Relypsa may not solicit, initiate, endorse, knowingly encourage or knowingly facilitate alternative acquisition proposals with other potential acquirors for the Company.

43. The Merger Agreement also contains an "information rights" provision. §5.3(b) of the Merger Agreement requires Relypsa to advise Galenica within 24 hours of any acquisition proposal or request for nonpublic information that it receives, as well as the identity of the party making the proposal or request and the material termsof. In addition, Relypsa must promptly notify Galenica of all developments in the discussions with any alternative bidder.

44. Moreover, §6.1 of the Merger Agreement restricts the Board's ability to effectuate a change in recommendation regarding the Proposed Transaction. In the event that the Board receives an unsolicited proposal, §6.1(c) provides that the Board may only effectuate a change of its recommendation in favor of the Proposed Transaction if it first determines in its good faith judgment, *after consultation with outside legal counsel*, that such proposal constitutes a Superior Proposal (as defined in the Merger Agreement) and that failure to effect such a change of recommendation would constitute a breach of the Board's fiduciary duties.

45. Further, even after the Board determines that the failure to effectuate a change in recommendation regarding the Proposed Transaction would result in a breach of the Board's fiduciary duties, the Merger Agreement then provides Parent with "matching rights." Specifically, §6.1(c) of the Merger Agreement requires that before the Board may effectuate such a change in recommendation, Relypsa must first provide Galenica with at least three (3) days written notice of its intention to change their recommendation during which time it must negotiate with Galenica to enable it to modify its proposal such that the alternative proposal no longer constitutes a Superior Proposal. Moreover, in the event that the alternative proposal is modified such that it again constitutes a superior proposal, Relypsa must repeat the process again and provide written notice and grant Galenica no less than two (2) business days to renegotiate and modify its proposal.

46. In other words, despite the inadequacy of the proposed consideration, the Merger Agreement gives Galenica access to any rival bidder's information and allows Galenica a free right to top any superior offer simply by matching it. Accordingly, no rival bidder is likely to emerge and act as a stalking horse, because the Merger Agreement unfairly assures that any "auction" will favor Galenica and will allow Galenica to piggy-back upon the due diligence of the foreclosed second bidder.

47. The Merger Agreement further provides that the Company must pay Galenica a termination fee of up to $49 million (approximately 3.2% of the equity value of the Proposed Transaction) following termination of the Merger Agreement under specified circumstances including if Relypsa enters into a transaction with a superior bidder.

48. As such, any competing bidder will have to pay a substantial naked premium just to match the inadequate consideration proposed by Galenica. Thus, the deal protection devices

unreasonably deter an alternative bidder from making a superior proposal that will adequately compensate the Company's shareholders.

49. Finally, as part of the Merger Agreement, Parent only requires the tender of one share more than 50% of Relypsa's outstanding shares in order to effectuate the Merger (the "Minimum Condition"). If the Minimum Condition is satisfied, Relypsa's remaining public shareholders that did not wish to accept the Offer will nevertheless loses their equity in the Company and have their shares cancelled and converted into a right to receive the same cash consideration as that provided in the Offer.

50. These preclusive deal protection provisions illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company and otherwise dissuade the Board from fulfilling its fiduciary duties to Relypsa shareholders. The circumstances under which third parties may submit an alternative proposal, or where the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal, are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

**E. <u>Insider Benefits</u>**

51. The Individual Defendants agreed to improperly relinquish Relypsa's stockholders' equity in the Company, and thereby their ability to participate in the Company's growth and accretion, for inadequate consideration in order to advance their own selfish interests and the interests of the other Defendants. The Individual Defendants disloyally placed their own interests first and tailored the terms and conditions of the Proposed Transaction to serve their own personal needs and objectives.

52. Moreover, at least as early as May 18, 2016, Galenica indicated that it intended on retaining Relypsa's management post-transaction and thus assured Relypsa insiders that they would retain their lucrative positions in the Company if it sold itself to Galenica.

53. As a result of the Proposed Transaction, the vesting of each Company option that remains outstanding, and the vesting of each outstanding Company Restricted Stock Units ("RSU") Awards, whether time-based or performance-based, will be accelerated in full with any performance condition being deemed achieved at 100%.

54. The following table sets forth, for each of Relypsa's executive officers and directors, their total Company options which have an exercise price per share less than $32.00 as of August 1, 2016.

| Name | Number of Shares Subject to Company Options Held | Weighted Average Exercise Price per Company Option | Total Consideration for Company Options |
|---|---|---|---|
| **Executive Officers** | | | |
| John A. Orwin | 994,877 | $ 12.27 | $ 19,624,804 |
| Kristine M. Ball | 264,975 | $ 12.55 | $ 5,153,235 |
| Stephen Harrison, Ph.D. | 135,000 | $ 27.96 | $ 544,950 |
| Lance Berman, M.D., M.S. | 156,347 | $ 18.12 | $ 2,169,876 |
| Scott Garland | 160,000 | $ 22.51 | $ 1,518,950 |
| Mary E. Corbett | 66,500 | $ 25.45 | $ 435,820 |
| Ronald A. Krasnow, Esq. | 173,938 | $ 13.11 | $ 3,286,353 |
| Wilhelm Stahl, Ph.D. | 178,645 | $ 12.69 | $ 3,450,372 |
| **Non-Employee Directors** | | | |
| John P. Butler | 32,960 | $ 13.32 | $ 615,549 |
| Paul J. Hastings | 46,083 | $ 8.09 | $ 1,102,049 |
| Kenneth J. Hillan, M.B., Ch.B. | 16,500 | $ 22.06 | $ 163,980 |
| David W.J. McGirr | 73,700 | $ 6.27 | $ 1,896,426 |
| Thomas J. Schuetz, M.D., Ph.D. | 53,349 | $ 7.28 | $ 1,318,765 |
| Daniel K. Spiegelman | 16,500 | $ 22.06 | $ 163,980 |
| Helen Torley, M.B., Ch.B., M.R.C.P. | 4,500 | $ 17.00 | $ 67,500 |

55. The following table quantifies the value of unvested Company options held by certain Company insiders as of August 1, 2016 that will become vested in connection with the Merger.

| Name | Number of Unvested Company Options | Total Value of Unvested Company Options |
|---|---|---|
| John A. Orwin | 389,751 | $ 5,893,776 |
| Kristine M. Ball | 95,038 | $ 1,014,824 |
| Stephen D. Harrison, Ph.D. | 96,980 | $ 399,913 |
| Lance Berman, M.D., M.S. | 87,200 | $ 795,046 |
| Scott Garland. | 107,918 | $ 944,038 |

56. The table below sets summarizes the Company RSU Awards held by each of Relypsa's executive officers and directors as of August 1, 2016.

| Name | Number of Shares Subject to Company RSU Awards Held | Total Consideration for Company RSU Awards |
|---|---|---|
| **Executive Officers** | | |
| John A. Orwin | 65,625 | $ 2,100,000 |
| Kristine M. Ball | 24,292 | $ 777,344 |
| Stephen Harrison, Ph.D. | 17,917 | $ 573,344 |
| Lance Berman, M.D., M.S. | 24,292 | $ 777,344 |
| Scott Garland | 17,917 | $ 573,344 |
| Mary E. Corbett | 16,917 | $ 541,344 |
| Ronald A. Krasnow, Esq. | 16,917 | $ 541,344 |
| Wilhelm Stahl, Ph.D. | 16,917 | $ 541,344 |
| **Non-Employee Directors** | | |
| John P. Butler | 2,250 | $ 72,000 |
| Paul J. Hastings | 2,250 | $ 72,000 |
| Kenneth J. Hillan, M.B., Ch.B. | 2,250 | $ 72,000 |
| David W.J. McGirr | 2,250 | $ 72,000 |
| Thomas J. Schuetz, M.D., Ph.D. | 2,250 | $ 72,000 |
| Daniel K. Spiegelman | 2,250 | $ 72,000 |
| Helen Torley, M.B., Ch.B., M.R.C.P | 2,250 | $ 72,000 |

57. Moreover, the consummation of the Offer will constitute a "Change in Control" under the terms of the Employment Agreements with Relypsa's executive officers and thus will entitle them to certain severance payments as summarized in the following table.

| Name | Cash Severance Payment | | COBRA Premiums | | Cash Bonus Payment (Pro-Rata) | |
|---|---|---|---|---|---|---|
| John A. Orwin | $ | 585,000 | $ | 24,337 | $ | 205,792 |
| Kristine M. Ball | $ | 400,000 | $ | 24,337 | $ | 93,808 |
| Stephen Harrison, Ph.D. | $ | 400,500 | $ | 0 | $ | 93,925 |
| Lance Berman, M.D., M.S. | $ | 433,700 | $ | 8,806 | $ | 101,712 |
| Scott Garland | $ | 433,700 | $ | 24,337 | $ | 101,712 |
| Mary E. Corbett | $ | 309,300 | $ | 17,532 | $ | 72,537 |
| Ronald A. Krasnow, Esq. | $ | 372,800 | $ | 24,337 | $ | 87,429 |
| Wilhelm Stahl, Ph.D. | $ | 372,800 | $ | 17,532 | $ | 87,429 |

58. Thus, while the Company's public shareholders will receive inadequate consideration, Company insiders stand to retain their lucrative jobs and reap millions of dollars in benefits not shared by other stockholders. Moreover, despite defendant Orwin's substantial financial interest in the Proposed Transaction, the Board nevertheless permitted him to lead the negotiations and steer the Company into the Merger Agreement with Galenica.

## F. The Conflicted Advisors

59. On April 25, 2016, the Board requested that Company management explore an engagement of Centerview to assist them in connection with an evaluation of strategic alternatives available to Relypsa, including continuing to operate as a stand-alone business or any proposal that might ultimately be submitted by Galenica or any other third party. However, at the time, the Board and management failed to consider, or otherwise disregarded, the fact that Centerview was already providing advisory services to Galenica in connection with its anticipated spin-off of Vifor Pharma Ltd. (Galenica's subsidiary and one of the equity holders of VFMCRP, Relypsa's collaboration partner in Europe). As a result of its services rendered to

Parent, Centerview is entitled to receive as much as $8.65 million in compensation.

60. Indeed, according to the Recommendation Statement, the Board first considered the significant conflict on May 27, 2016, *i.e.* after permitting Centerview to run the "sales process," severely restrict the potential counter-parties to be contacted, and communicate with the few unsolicited interested parties that had contacted Relypsa.

61. Moreover, even after the Board noted this significant conflict of interest, and authorized management to engage BofA as a second (purportedly unconflicted advisor) they nevertheless permitted Centerview to continue to advise on and lead the process, and to contact and communicate directly with the other potentially interested parties. (Tellingly, in the middle of June, 2016, Galenica, Centerview's client and preferred acquiror, indicated that they would make a proposal to acquire the Company's shares at a purchase price in the "low-$30's" just days before "Party-A" purportedly told Centerview that it would be interested in discussing a potential acquisition of Relypsa in the "low $30's" per share.)

62. Compounding Centerview's conflict, Relypsa has agreed to pay Centerview approximately $19.5 million for its services in connection with the Proposed Transaction, $18.5 million of which is contingent on the consummation of same. Thus, instead of ensuring that Relypsa shareholders received the highest consideration available for their equity interest in Relypsa, Centerview was improperly incentivized to prioritize the instant transaction with its favored acquiror and client, Galenica. Moreover, even BofA was incentivized to "rubber stamp" the Proposed Transaction since almost one-third of its compensation is contingent on the consummation of the Offer.

## G. The Incomplete and Materially Misleading Recommendation Statement

63. On August 4, 2016, Relypsa filed the Recommendation Statement with the SEC

in connection with the Proposed Transaction in order to recommend that the Company's shareholders tender their shares in the Offer. However, in violation of Sections 14(e) and 20(a) of the Exchange Act, the Recommendation Statement fails to disclose and misstates material information and, as a result, Relypa's public stockholders are being forced to tender, or otherwise surrender, their shares with incomplete and misleading information.

***Omissions Concerning the Background of the Transaction***

64. The Recommendation Statement fails to provide material information, or otherwise provides misleading information, concerning the process conducted by the Company and the events leading up to the Proposed Transaction. Specifically, the Recommendation Statement failed to disclose:

a. why the unnamed party, *i.e.* one of the just two additional parties identified as "most likely to be interested in an acquisition of Relypsa," was never contacted;

b. whether the Board ever identified, or attempted to identify, the source of the December 4, 2015 and April 7, 2016 leaks, which the Board used as a basis for limiting its outreach during the "sales process;"

c. the basis for defendant Butler's recusal from all discussions concerning the sales process, which was purportedly considered and discussed by the Board on multiple occasions;

d. the status and progress of the License Agreement with VFMCRP and efforts to commercialize Veltassa outside the United States and Japan, and the royalties and other payments due to be paid to Relypsa thereunder;

e. when the Board first learned of and considered Centerview's conflicts of interest resulting from its retention by Parent and/or its affiliates;

f. the context and basis for forming the Strategic Transaction Committee; how its members were selected; and the reason for forming the committee so late in the "process" and only after a single alternative acquiror, *i.e.* Party A, remained in the negotiations;

g. the basis for permitting Centerview and defendant Orwin to continue leading the negotiations and communicating with interested parties, including Party A, despite Centerview's conflict of interest and the Board's formation of the Strategic Transaction Committee;

h. whether the Board, or a representative thereof, communicated to Party A, or any other interested party, that they believed an offer closer to $34 per share was more appropriate, which they communicated to Galenica;

i. the basis for defendant Orwin's purported determination that Galenica would not offer more than $32 per Relypsa share;

j. the "valuation and other strategic priorities for Party A" that made it difficult for Party A to pursue a transaction with the Company;

k. when the parties first discussed the potential post-transaction retention of Relypsa management and/or other Company insiders or the treatment of unvested options or RSU's;

l. the basis for the Board's failure to contact other potential counterparties and its "belief that the most likely strategic counterparties had already been contacted" despite the fact that the list of potential parties was compiled by a highly conflicted advisor and one of the just two the Board identified as "most likely to be interested in an acquisition of Relypsa" was never contacted; and

m. if and how management updated its projections in light of the FDA's decision that an NDA to market ZS-9 would not be approved and/or the additional value ascribed to Relypsa resulting from that decision;

n. whether Centerview contacted, or proposed to contact each of the identified "comparable companies" or acquirors in the precedent transaction (utilized in its valuation analyses) to gauge their potential interest in acquiring Relypsa; and

o. the basis for including standstill provisions in the confidentiality agreements with the potentially interested parties but excluding such a provision from the agreement with Parent.

***Omissions Concerning Managements Projections***

65. The Recommendation Statement fails to disclose (i) "the forecasted fully-taxed unlevered free cash flows" of Relypsa utilized by Centerview and BofA in their DCF analyses; (ii) the "certain unaudited prospective financial information included in the Final Unaudited Prospective Financial Information [] made available to Parent" or the "mean of publicly available Wall Street analyst estimates for Relypsa's future revenues" provided Galenica; (iii) why Galenica, or any of the other potentially interested parties, were not provided with the complete projections utilized by Centerview, BofA, and the Board; (iv) if and how management updated its projections in light of the FDA's decision that an NDA to market ZS-9 would not be approved and/or the additional value ascribed to Relypsa resulting from that decision; and (v) the basis for preparing three "cases" of projections and whether the adverse ZS-9 decision rendered any of the cases more likely.

***Omissions Concerning Centerview's and BofA's Financial Analyses***

66. The Recommendation Statement also fails to disclose the underlying

methodologies and key inputs relied upon and observed by Centerview and BofA in valuing Relypsa and assessing the fairness of the Proposed Transaction. Specifically, the Recommendation Statement fails to disclose:

a. In the *DCF* Analyses, "the forecasted fully-taxed unlevered free cash flows of Relypsa" for each of the years and how they were derived from managements' projections, including any adjustments made thereto; the Company's estimated "weighted average cost of capital" and how it was calculated; the basis for the unreasonable discount rates; the basis for the 10% discount applied to the $250 million equity offering; if and how BofA accounted for Relypsa's cash balance, outstanding notes, tax savings from net operating losses, and Relypsa's tax rate and net cash assumed by BofA;

b. In Centerview's *Selected Comparable Public Company Analysis*, the basis for excluding the Company's "collaboration and milestone revenue" (*i.e.* not utilizing Relypsa's "total revenue") in its analyses; how Relypsa's "cash balances" were calculated and why the assumed figure differed significantly from the cash figure assumed by BofA; whether the enterprise values of the comparable companies included outstanding warrants (utilizing the Black Scholes Value); whether and how adjustments were made to the comparable companies valuations for RSUs, options and unvested shares; the source and substance of the "Wall Street research analyst consensus estimated revenue" for the analyzed companies; whether it performed any benchmarking in its selection and analysis; the specific figures and metrics for each of the analyzed companies; and the basis for excluding TESARO, Inc., Nektar Therapeutics, Radius Health, Inc., Pacira Pharmaceuticals,

Inc., Puma Biotechnology, Inc. and Heron Therapeutics, Inc. from its analyses (despite being noted as comparable companies by BofA);

c. In BofA's *Selected Publicly Traded Companies Analyses*, the basis for excluding the Company's "collaboration and milestone revenue" (*i.e.* not utilizing Relypsa's "total revenue") in its analyses; how Relypsa's "net cash" was calculated and why the assumed figure differed significantly from the cash figure assumed by Centerview; whether Relpysa's assumed net cash figure excluded cash equivalents, and, if so, why; whether the enterprise values of the comparable companies included outstanding warrants (utilizing the Black Scholes Value); whether and how adjustments were made to the comparable companies valuations for RSUs, options and unvested shares; the source and substance of the "Wall Street consensus estimates of [] net revenues" for the analyzed companies; whether it performed any benchmarking in its selection and analysis; the specific figures and metrics for each of the analyzed companies; the basis for excluding Basilea Pharmaceutica Ltd., Exelixis, Inc. and Intercept Pharmaceuticals, Inc. from its analyses (despite being noted as comparable companies by Centerview);

d. In the *Selected [Precedent] Transactions Analyses*, the basis for the inclusion/exclusion of precedent transactions analyzed by Centerview/BofA in the other advisors analysis; whether they performed any benchmarking in their selection and analysis; the basis for utilizing old and stale deals which skewed the observed range of multiples; the specific metrics observed in each of the analyzed transactions; the mean multiple observed by Centerview; and whether and how BofA adjusted for adjusted for Relypsa's (i) cash balances, (ii) $150 million in

outstanding senior secured notes as of June 30, 2016 and (iii) certain costs associated with debt prepayment penalties and payments due under certain license agreements; and

e. In the *Other Considerations*, the number, date, and source of the analyst price targets; and the individually observed premia considered and derived from the analyzed precedent transactions.

**FIRST CAUSE OF ACTION**

**(Against the Individual Defendants for Violations of Sections 14(e) of the Exchange Act)**

67. Plaintiff repeats and realleges each allegation set forth herein.

68. During the relevant period, defendants disseminated the false and misleading Recommendation Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of section 14(e) of the Exchange Act and SEC Rules promulgated thereunder.

69. By virtue of their positions within the Company, the defendants were aware of this information and of their duty to disclose this information in the Recommendation Statement. The Recommendation Statement was prepared, reviewed, and/or disseminated by the defendants. The Recommendation Statement misrepresented and/or omitted material facts, including material information about the unfair sale process for the Company, the unfair consideration offered in the Proposed Transaction, and the actual intrinsic value of the Company's assets. The defendants were at least negligent in filing the Recommendation Statement with these materially false and misleading statements. The defendants have also failed to correct the Recommendation Statement and the failure to update and correct false statements is also a violation of section

14(e) of the Exchange Act and SEC Rules promulgated thereunder.

70. The omissions and false and misleading statements in the Recommendation Statement are material in that a reasonable stockholder would consider them important in deciding whether to tender their shares in the Proposed Transaction. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Recommendation Statement and in other information reasonably available to stockholders.

71. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from immediate and irreparable injury, which the Individual Defendants' actions threaten to inflict.

## SECOND CAUSE OF ACTION

**(Against the Individual Defendants for Violation of Section 20(a) of the Exchange Act)**

72. Plaintiff repeats and realleges each allegation set forth herein.

73. The Individual Defendants acted as controlling persons of Relypsa within the meaning of section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers or directors of Relypsa and participation in or awareness of the Company's operations or intimate knowledge of the false statements contained in the Recommendation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

74. Each of the Individual Defendants was provided with or had unlimited access to copies of the Recommendation Statement and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued and had the ability to prevent the

issuance of the statements or cause the statements to be corrected.

75. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Recommendation Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of this document.

76. In addition, as the Recommendation Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Recommendation Statement purports to describe the various issues and information that they reviewed and considered — descriptions which had input from the Individual Defendants.

77. By virtue of the foregoing, the Individual Defendants have violated section 20(a) of the Exchange Act.

78. Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands relief in his favor against Defendants as follows:

A. Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction, unless and until the Company adopts and implements a procedure or process to obtain the best available terms for shareholders;

B. Rescinding, to the extent already implemented, the Proposed Transaction or any of the terms thereof, or granting Plaintiff rescissory damages;

D. Directing the Individual Defendants to account to Plaintiff for all damages

suffered as a result of the wrongdoing;

E. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorney' and experts' fees; and

F. Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff prays for a jury trial on all issues and in all proceedings so triable.

Dated: August 16, 2016

BRODSKY & SMITH, LLC

By:______________________
EVAN J. SMITH (S.B. # 242352)
9595 Wilshire Boulevard, Suite 900
Beverly Hills, CA 90212
Tel: (877) 834-2590

BROWER PIVEN
A Professional Corporation
Brian C. Kerr
475 Park Avenue South, 33rd Floor
New York, NY 10016
Tel. (212) 501-9000

*Attorneys for Plaintiff*